

**FILED & ENTERED**

**NOV 13 2014**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY huerta    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>SAEED COHEN,<br><br>     Debtor. | Case No.: 2:13-bk-26483-NB<br><br>Chapter 11<br><br>**MEMORANDUM DECISION ON "ISSUE 1" RELATED TO WHETHER IRS CLAIM IS A COMMUNITY CLAIM**<br><br>Date:  July 24, 2014<br>Time:  1:30 p.m.<br>Place:  Courtroom 1545<br>      255 E. Temple Street<br>      Los Angeles, CA 90012 |

## I. INTRODUCTION

Tax debts that arise during marriage are "community claims" in bankruptcy parlance, and they are payable from community property. In this case the debtor's wife argues that her interest in community property somehow ceased to be liable for those tax debts because, after she separated from the debtor, he entered into a settlement with the Internal Revenue Service ("IRS"). She cites no authority that is on point, and this court rejects her arguments. This court also holds that certain entities in which the bankruptcy estate holds an interest are entitled to interpled funds in litigation to which the IRS is a party, and sustains in part and overrules in part various objections to the claims asserted by the IRS.

## II. BACKGROUND[1]

In 1989 the debtor, Mr. Cohen ("Debtor"), was married to Ms. Fariba Cohen ("Ms. Cohen").  They separated in 2010 (the parties disagree on the precise separation date, but it makes no difference for purposes of this memorandum decision).  *See* Dkt. 60 at 10:10–11; 97; 460 at 5:12.  Just before their divorce trial was set to resume, Debtor filed his voluntary chapter 11 bankruptcy petition on June 25, 2013 (the "Petition Date").  Dkt. 60 at 10:16-19.  It is undisputed that by this time Debtor and Ms. Cohen had already incurred an astounding total of more than <u>$13 million</u> in legal fees in connection with their divorce.

Ms. Cohen has sought relief from the automatic stay (Section 362(a)) to continue her divorce litigation in State court.  She has also argued that the automatic stay does not apply to some of the divorce proceedings, and that this court must or should abstain.  She now reiterates many of these arguments.  *See, e.g.,* dkt. 242 at 15:18-21:12.  The official committee of creditors holding unsecured claims (the "Committee") and Debtor oppose that relief.

This court has rejected Ms. Cohen's arguments before, and does so again.  Those arguments are not properly raised at this time (*see* dkt. 256 at 13:1-16:21) (Committee's Brief) and alternatively this court rejects the arguments on the merits, for the same reasons as before.  Among other things, the divorce trial would eat up more millions of dollars on litigation that very likely would be irrelevant, such as allocation of assets between Debtor and Ms. Cohen when, in all likelihood, there will be few or no assets left to allocate.  *See, e.g.,* dkt. 60, 134, 135, 223, 256 at 16:22-18:14, *and* Adv. 2:14-ap-01484 dkt. 16 & 17.

On June 3, 2014, this court issued a scheduling order pursuant to a stipulation

---

[1] For brevity, filed documents are referred to by docket number ("dkt.") rather than their full title.  Many arguments are repeated in numerous briefs, and this Memorandum Decision usually cites the briefs filed in the main bankruptcy case rather than the briefs in the adversary proceedings.  Unless the context suggests otherwise, references to a "chapter" or "section" ("§") refer to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code"), a "Rule" means one of the Federal Rules of Bankruptcy Procedure ("FRBP"), Federal Rules of Civil Procedure ("FRCP"),  or other federal or local rule, and other terms have the meanings provided in the Code, the Rules, and the parties' briefs.

among Debtor, Ms. Cohen, the Committee, and the IRS.  *See* Dkt. 375, 394, 407, 448.

This memorandum decision addresses Issues 1(a), 1(b), and 1(c) in that scheduling

order:

Issue #1(a) — whether any of the claims asserted by the IRS against Debtor's

estate are an allowed "community claim" as defined in Section 101(7), or if instead they

are the separate debt of Debtor (or of Ms. Cohen) payable from property other than the

kind identified in Section 541(a)(2);

Issue #1(b) — resolution of two adversary proceedings: *Lighton Property, LLC v.

Cohen*, 2:14-ap-01194-NB ("*Lighton*"), and *Nazarian v. Cohen*, 2:14-ap-01195-NB

("*Nazarian*"); and

Issue #1(c) — resolution of the Committee's objection to the IRS claims asserted

in its amended proof of claim 3-2 (the "IRS Claim").

In connection with the foregoing issues this court has reviewed the parties' briefs

in the bankruptcy case (dkt. 460–467), the documents referenced therein including in

the *Lighton* and *Nazarian* adversary proceedings, the documents referenced below, and

all other documents that this court has deemed relevant.  For the reasons set forth

below this court is not persuaded that it is necessary to hold an evidentiary hearing on

any of these issues.

Some issues have been presented through formal motions for summary

judgment, and others are presented as claim objections, all as modified by the

scheduling order.  The parties are all familiar with the standards for determining if there

are genuine issues of material fact (*see, e.g., Lighton Adv.* dkt. 10, Ex. 33), and this

court will not repeat them here.

**A. Facts underlying Issue 1(a)**

The IRS Claim is for over $8 million.  The IRS asserts that most of this is a

community claim that arises from 2003 through 2008 when Debtor and Ms. Cohen were

married.

There is no dispute that Amp Plus, Inc. dba Elco Lighting ("Elco") and the income

from it are community assets and have been at all relevant times.  *See Lighton Adv.* dkt. 10, Ex. 33 (ex. 2&3 thereto).  During the marriage, multiple foreign bank accounts were used "to hold unreported income from [Elco]," aggregating approximately $35 million by 2008.  Dkt. 461 at 6:7–14.

Taxpayers who have foreign bank accounts with over $10,000 at any time during a calendar year are required to disclose the existence of these accounts to the IRS on a foreign bank account report ("FBAR").  31 U.S.C. § 5314.  *See* dkt. 461 at 7:12–17.  For 2003 through 2008, Debtor and Ms. Cohen failed to file FBARs.  To the contrary, they filed joint income tax returns verifying – incorrectly – that they did not have any such accounts.  According to Debtor, this subjected them to possible penalties of $58 million or more.  Dkt. 461 at 8:24–25.[2]

In 2011, after Debtor and Ms. Cohen separated, he participated in a disclosure and settlement program, the Offshore Voluntary Disclosure Initiative ("OVDI"), and entered into a "closing" agreement (settlement) with the IRS for approximately $8.7 million.  The IRS characterizes this as a "miscellaneous penalty" pursuant to 26 U.S.C. § 7121.  Dkt. 245 at 5:6–12; *and see* Proof of Claim 3-2.

Ms. Cohen notified the IRS that she was opting out of the OVDI.  Instead she has attempted (so far unsuccessfully) to assert an entitlement to an "innocent spouse" defense under 26 U.S.C. § 6015.  *See Nazarian Adv.* dkt. 12 at 3:2–3 (Ms. Cohen's Brief); *see also* dkt. 465 at 6 n.8 (Committee Brief) *and* dkt. 245 at 12:20-13:2 (IRS Brief).

Meanwhile, before this bankruptcy court, Ms. Cohen has argued that the IRS Claim arises not from the 2003 through 2008 failure to file FBARs and false statements

---

[2] Debtor provides an example of how the principal FBAR penalties work: "For willful failures to timely file FBARs occurring after October 22, 2004, the maximum civil penalty is the greater of $100,000 or 50 percent of the high balance in the account during the taxable year for each year for which there is a failure to timely file an FBAR. *See* 31 U.S.C. § 5321(a)(5). Thus, for example, if a taxpayer had a high balance in a foreign bank account of $30 million earning zero interest for six straight years and willfully failed to file FBARs for each of those six years, the taxpayer could be subject to maximum penalties of $90 million (50% x $30 million x 6 years), even though the account balance never exceeded $30 million. This failure to report penalty is completely separate from income tax penalties, and from any taxes and interest owed as the result of failing to report all income on a taxpayer's return." Dkt. 461 at 4:18–26.

on the joint tax returns, but instead from the post-separation OVDI agreement, and therefore, she asserts, the debt was not "incurred" during marriage and the community property of the bankruptcy estate is not liable for it.  In support of this argument, she asserts among other things that there is no such thing as the "miscellaneous penalty" claimed by the IRS, so the debt allegedly must have been incurred when the post-separation OVDI contract became effective.

### B. Additional facts underlying Issue 1(b)

The *Lighton* and *Nazarian* interpleader actions have been referred to this bankruptcy court.  *See Lighton Adv.* dkt. 10, Ex. 60; *Nazarian Adv.* dkt. 10, Ex. 76.  In *Lighton* the issue is who, as between the IRS, Ms. Cohen, and Debtor or his bankruptcy estate is entitled to rents paid by Elco to its landlord and affiliate, Lighton Property, LLC ("Lighton").  In *Nazarian* the issue is who is entitled to repayment of approximately $1 million that was loaned to plaintiff Nazarian in 2009, either from Elco or from Debtor or both.  The IRS has filed motions for summary judgment in both actions.  *See Lighton Adv.* dkt. 10, Ex. 33; *Nazarian Adv.* dkt. 10, Ex. 28.

### C.  Additional facts underlying Issue 1(c)

The IRS Claim consists of (1) a secured claim for $8,208,469.29 based on the OVDI settlement and (2) certain other unsecured claims relating to Ms. Cohen's tax liabilities for years 2009 through 2011 and Mr. Cohen's tax liability for tax year 2012. The Committee has objected to the IRS Claim on various grounds, the other parties have filed briefs, and some of the issues initially raised by the Committee are no longer contested by the IRS.  *See* dkt. 219, 242, 245, 254, 256.

## III.  JURISDICTION, AUTHORITY, AND VENUE

The Supreme Court has distinguished between (a) bankruptcy courts' broad subject matter jurisdiction and (b) their narrower constitutional and statutory "authority" to issue final judgments or orders.  Whenever the bankruptcy court lacks such authority then its determinations constitute only proposed findings of fact and conclusions of law that are subject to *de novo* review by an Article III court.  *See Stern v. Marshall*, 564

U.S. 2; 131 S.Ct. 2594 (2011); *Law v. Siegel*, __ U.S. __; 134 S.Ct. 1188 (2014); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 567 (9th Cir. 2012), *aff'd sub nom Executive Benefits Ins. Agency v. Arkison,* __ U.S. __, 134 S.Ct. 2165 (2014) *Executive Benefits Ins. Agency v. Arkison,* __ U.S. __, 134 S.Ct. 2165 (2014).  This court has an independent duty to examine these issues.  *See In re Rosson,* 545 F.3d 764, 769 n. 5 (9th Cir. 2008) (subject matter jurisdiction); *In re Pringle*, 495 B.R. 447, 455 (9th Cir. BAP 2013) (authority under *Stern*).

### A.  This court has subject matter jurisdiction

Bankruptcy courts are "units" of the federal district courts, to which all bankruptcy proceedings have been referred or local rule or standing order in each district.  *See* 28 U.S.C. § 151; Cent. Dist. Cal. General Order No. 13-05; LBR 5011-1(a).  As such, this court has jurisdiction over all civil proceedings (1) "arising under title 11," *i.e.,* any proceedings to enforce rights created by the Bankruptcy Code, (2) "arising in" a bankruptcy case, *i.e.,* other proceedings that would not exist outside a bankruptcy case, such as case administration, or (3) "related to" a bankruptcy case, *i.e.,* any proceedings the outcome of which could conceivably have any effect on the bankruptcy estate.  *See* 28 U.S.C. §§ 157(a), 1334(b); *In re Harris*, 590 F.3d 730, 737 (9th Cir. 2009) (summarizing jurisdictional standards); *In re Marshall*, 600 F.3d 1037, 1054 (9th Cir. 2010) (same); *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988) (adopting "related to" test of *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir.1984)).

The matters addressed in this memorandum decision are all quintessentially "arising under" and "arising in" proceedings because they consist of determining the parties' "hierarchically ordered claims to a pro rata share of the bankruptcy res." *Stern*, 131 S.Ct. at 2614 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)). (The quoted phrase is from the Supreme Court's discussion of a non-jurisdictional issue – what proceedings are "core" – but the same concept presumably applies to jurisdictional issues because the Court interpreted statutory "core" proceedings to be coterminous with statutory "arising in" and "arising under" jurisdiction.  *Id.* at 2605.)

Alternatively, assuming for the sake of argument that there were any question on this point, this court at the very least has "related to" jurisdiction.  In short, this bankruptcy court has subject matter jurisdiction.

**B.  This court has the authority to issue final judgments or orders**

The bankruptcy courts' authority to issue final judgments or orders is governed both (1) by federal statute and (2) by the United States Constitution.

**1.  Statutory authority**

Bankruptcy courts have the statutory authority to issue final judgments or orders in "core" proceedings.  28 U.S.C. § 157(b)(2).  Congress used that terminology in an attempt to track the Supreme Court plurality's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71 (1982).

The statutory list is non-exclusive (28 U.S.C. § 157(b)(2)) but the courts have been careful to interpret the statute and its "catchall" provisions to stay within constitutional limits, and they have considered "factors such as whether the rights involved exist independent of title 11, depend on state law for their resolution, existed prior to the filing of a bankruptcy petition, or were significantly affected by the filing of the bankruptcy case."  *In re Cinematronics, Inc.*, 916 F.2d 1444, 1450 n.5 (9th Cir. 1990).  *See also In re Castlerock Prop's,* 781 F.2d 159 (9th Cir. 1986).  This court also bears in mind that a "determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."  28 U.S.C. § 157(b)(3).

The issues addressed in this memorandum decision come within the statutory definition of core proceedings, including allowance or disallowance of the IRS claims (28 U.S.C. § 157(b)(2)(B)); determination of the extent and priority of its asserted liens and interests over the claims of Ms. Cohen and other parties in interest (*id.,* subpara. (K)); and adjustment of the debtor's financial relationships with the IRS and Ms. Cohen in her assertion of claims and interests in the bankruptcy *res* (*id.,* subpara. (O)).  This court therefore has statutory authority to issue a final judgment or order.

### 2. Constitutional authority

To safeguard "individual liberty and separation of powers" there are constitutional limits on the authority of bankruptcy judges, who are not appointed pursuant to Article III of the Constitution, to issue final judgments and orders. *Stern*, 131 S.Ct. at 2615. In analyzing those limits the Supreme Court has focused primarily on whether the "public rights" exception to Article III applies. *See, e.g., id.* at 2611-15 & 2618-19 (plurality opinion).

One definition of "public rights" is that if "it depends upon the will of [C]ongress whether a remedy in the courts shall be allowed at all,' [then] Congress could limit the extent to which a judicial forum was available." *Stern* at 2612 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. 272, 18 How. 272 at 284 (1855)). For example, a bankruptcy discharge arguably is a matter of public rights because Congress need not provide any discharge at all.

The same reasoning arguably could apply more broadly, because Congress need not enact any bankruptcy laws at all. At one point the Supreme Court stated that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power … may well be a 'public right.'" *Marathon,* 458 U.S. at 71 (plurality opinion).

More recent decisions, however, have expressly declined to endorse such a general rule. *See Stern*, 131 S.Ct. at 2614 n.7 (plurality opinion); *Bellingham*, 702 F.3d at 561 (acknowledging "demise" of general rule that controversies at the "core of the bankruptcy process implicated public rights"). Unfortunately, no alternative general rule has emerged. As the Supreme Court has acknowledged, its reasoning has not been "entirely consistent." *Stern*, 131 S.Ct. at 2611 (plurality); *and id.* at 2621 (Scalia, J., concurring).

Nevertheless, the *Stern* plurality has articulated two alternative tests to determine when a Bankruptcy Judge can issue a final judgment or order:

… Congress may not bypass Article III simply because a

proceeding may have *some* bearing on a bankruptcy case; <u>the question is whether the action at issue [a] stems from the bankruptcy itself or [b] would necessarily be resolved in the claims allowance process.</u>  [*Stern*, 131 S.Ct. at 2618 (underlining added, citation omitted)]

These two alternatives are examined below.

### a.  Constitutional authority to adjudicate claims that "stem[] from the bankruptcy itself"

This first test – whether the action at issue "stems from the bankruptcy itself" (*Stern*, 131 S.Ct. at 2618) – initially sounds very similar to the pre-*Stern* test – whether the controversy at issue is at the "core of the bankruptcy process."  *Bellingham*, 702 F.3d at 561.  Fortunately, the Ninth Circuit has explained, after a careful review of *Granfinanciera*, *Stern*, and other Supreme Court cases, that the difference is whether there is a jury right:

> *Stern* fully equated bankruptcy litigants' Seventh Amendment right to a jury trial in federal bankruptcy proceedings with their right to proceed before an Article III judge.  [*Bellingham*, 702 F.3d 553, 563]

In other words, under *Stern*'s first test, the statutory definition of core proceedings fails to meet constitutional muster when a party is entitled to have the proceeding heard by a jury.

In this case, the parties have not established that they are being deprived of any right to a jury as to any of the issues addressed in this memorandum decision.  Therefore, under *Stern*'s first alternative test, this bankruptcy court has the constitutional authority to issue a final judgment or order on all of the issues presented.

### b.  Alternative Constitutional authority to adjudicate matters that "would necessarily be resolved in the claims allowance process"

In referring to an action that "would *necessarily* be resolved in the claims allowance process" (*Stern*, 131 S.Ct. at 2618, emphasis added), the *Stern* plurality apparently means to encompass both (i) the adjudication of "hierarchically ordered claims to a pro rata share of the bankruptcy res" (*id*. at 2614) and (ii) the adjudication of

constitutionally *non*-core issues that are *necessary* to the allowance or disallowance of

filed claims.   Under the latter principle, when a party has filed a proof of claim, then the

bankruptcy court can issue a final judgment or order if the allowance or disallowance of

that claim *necessarily* requires adjudication of issues that normally would require a jury

or are not statutorily core.   *See Stern,* 131 S.Ct. at 2615-18 (plurality opinion, Part

III.C.2); *Langenkamp v. Culp*, 498 U.S. 42 (1990) (although alleged recipient of

avoidable preference normally is entitled to jury, there is no such right if creditor files

proof of claim, because claims allowance process necessarily involves determination of

preference issues); *Katchen v. Landy*, 382 U.S. 323 (1966) (bankruptcy referee could

use summary proceeding without jury to determine preference claim, because

preference issues necessarily had to be resolved in the course of claims-allowance

process); *Bellingham,* 702 F.3d at 562,  n. 7 (distinguishing final adjudication of

fraudulent transfer action by bankruptcy court when creditor had filed a proof of claim

and it was "not possible" to rule on allowance of the proof of claim without first resolving

the fraudulent transfer issue) (citation omitted); *In re Deitz*, 760 F.3d 1038 (9th Cir.

2014), *adopting In re Deitz*, 469 B.R. 11, 17-24  (9th Cir. BAP 2012) (bankruptcy court

can enter final judgment on underlying non-core claims that necessarily are part of

adjudicating nondischargeability action); *In re Wash. Coast I, LLC,* 485 B.R. 393, 406-

07 (9th Cir. BAP 2012) ("[T]he determination of priority between two creditors … is not

only tied to the claims resolution process, but it also involves the adjudication of rights

created by the Bankruptcy Code under § 506.  … Accordingly, the bankruptcy court's

exercise of power over the lien priority dispute was a constitutional delegation of power

from Congress.") (citation omitted).

In this case, Issues 1(a), 1(b) and 1(c) are part of determining the "hierarchically

ordered claims to a pro rata share of the bankruptcy res."  *Stern*, 131 S.Ct. at 2614.  In

addition, supposing for the sake of discussion that some of the parties' *underlying*

claims normally would have to be tried to a jury or are statutorily non-core, those

underlying claims "would *necessarily* be resolved in the [bankruptcy] claims allowance

process." *Id.* at 2618 (emphasis added).  For each of these alternative reasons, this court has the constitutional authority to issue a final judgment or order on all of the issues presented.

### c. Alternative constitutional authority to adjudicate pretrial matters

Even in a constitutionally non-core proceeding under Stern, the bankruptcy court can resolve pretrial matters, including case-dispositive motions that do not require factual findings.  *See In re Professional Satellite and Communication, LLC*, 2012 WL 6012829, at *3 (S.D. Cal.); *In re Heller Ehrman, LLP*, 2011 WL 4542512, at *3 (Bankr. N.D. Cal.) (citing *In re Healthcentral.com,* 504 F.3d 775, 787 (9th Cir. 2007)).  *See also Arkison,* 134 S.Ct. 2165 (district court's *de novo* review was same under appeal from summary judgment ruling as it would have been for proposed findings of fact and conclusions of law).

In this case, the issues can be determined on the uncontested facts and the law (with very limited exceptions, as to which this court is not ruling, as noted below). Therefore, this is an alternative reason why this court has the constitutional authority to issue a final judgment or order on all of the issues addressed below.

### d. Alternative constitutional authority if parties have expressly or impliedly consented

At least under current the Ninth Circuit authority, parties can consent to final adjudication of claims that are constitutionally non-core, and such consent may be implied.  *See Bellingham,* 702 F.3d 553 (litigant consented to adjudication by bankruptcy judge by failing timely to object), *aff'd on other grounds*, *Arkison*, 134 S. Ct. 2165; *Pringle*, 495 B.R. 447 (rebuttable presumption that failure to challenge authority to issue final order is intentional and indicates consent).  *See also Stern*, 131 S.Ct. 2594, 2608 (if litigant "believed that the Bankruptcy Court lacked the authority to decide his claim…then he should have said so – and said so promptly.").

In this case, Debtor and the Committee have expressly consented to this court's

1  entry of final orders or judgments (*see* dkt. 394 at 25-27), but both the IRS and Ms.

2  Cohen have expressly declined to provide such consent (dkt. 387, 419).  Accordingly,

3  this alternative ground for this court's authority to enter final orders or judgments is not

4  available.

5       **C.  Conclusion as to jurisdiction, authority, and venue**

6       For the reasons set forth above, this bankruptcy court has both subject matter

7  jurisdiction and the authority to enter final judgments and orders on the issues

8  addressed below.  Venue is proper under 28 U.S.C. §§ 1408(1) and 1409(a).

9  **IV. DISCUSSION**

10       As a preliminary matter, the Committee argues (dkt. 465, 13:13–20 & n. 17) for

11  judicial estoppel.  The Committee cites a transcript (dkt. 257-2, Ex. B) in which the State

12  court asks Ms. Cohen's counsel to confirm that "the tax" is "a community property

13  obligation" and he responds, "It has been paid.  We're not disputing that it's a

14  community property obligation."  *Id.* at 9:16-17 & 9:25-26.  It is not clear what tax is "the

15  tax" in this quoted colloquy, but the IRS claim in this case has not "been paid" so it

16  appears that Ms. Cohen's counsel was referring to some other tax debt.  In any event,

17  the evidence is not sufficiently clear to apply judicial estoppel.

18       A few of Ms. Cohen's papers and arguments appear to have been presented

19  without observing the normal procedural requirements do so (*see* dkt. 256 at 2:9-15 &

20  13:1-16:11) (Committee Brief).  Nevertheless, this court has considered these

21  documents and for the reasons set forth below, is unpersuaded.

22       One more preliminary issue is that prepetition the IRS filed five notices of federal

23  tax liens with respect to its miscellaneous penalty of over $8 million.  For most of the

24  following discussion, that is irrelevant.  The overriding issue is whether there is any

25  claim at all against community property, not whether that claim is secured or unsecured.

26       For ease of discussion, the following analysis focuses first on Ms. Cohen's

27  arguments regarding the IRS claim.  Other issues are discussed thereafter.

28

**A. Federal bankruptcy law**

**Community property:**

> The commencement of a [bankruptcy] case … creates an estate. Such estate is comprised of [in addition to other assets] [a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is —
>
> > (A) under the sole, equal, or joint management and control of the debtor; or
> >
> > (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.  [11 U.S.C. § 541(a)(2)]

Such property is referred to in this Memorandum Decision as "Estate Community Property."

**Community claim:**

> The term "community claim" means claim that arose before the commencement of the case concerning the debtor for which [Estate Community Property] is liable, whether or not there is any such property at the time of the commencement of the case.  [11 U.S.C. § 101(7)]

**Distributions.**  The Bankruptcy Code's distribution scheme regarding community property is generally intended to parallel state law.  As discussed in more detail below, creditors are entitled to be paid first, and if there are any remaining assets in the bankruptcy estate then those assets are distributed to the equity owners, *i.e.,* the spouses.  If there are any differences between State law and the bankruptcy distribution scheme, then the state law scheme is preempted. *See, e.g.,* 6 *Collier on Bankruptcy* ¶ 726.04 & 726.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (State laws are preempted to extent of any inconsistency with Bankruptcy Code's "waterfall" of distributions out of "sub-estates").

In this case, Ms. Cohen has not asserted a claim for any prepetition support payments (as distinguished from any postpetition support payments that might be payable under 11 U.S.C. § 1129(a)(14)).  Nor has Ms. Cohen asserted that most of the property at issue is her separate property.  Nevertheless, some of her arguments presuppose that she is entitled to distributions on a par with creditors, or ahead of them.

For the reasons discussed below, those arguments are contrary to California law, and alternatively they are contrary to the Bankruptcy Code's distribution scheme.

### B. Issue 1(a): the bulk of the IRS Claim is a community claim

#### 1. Governing law

"Apart from [any provisions of federal bankruptcy that override State law], Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979). *See also In re McCoy*, 111 B.R. 276, 279 (9th Cir. BAP 1990).

Under California law, it is helpful to distinguish between *in personam* liability and *in rem* liability. Creditors can reach community property to pay debts incurred by either spouse during marriage, regardless whether any right to reimbursement exists as between the spouses. *See Lezine v. Sec. Pac. Fin. Serv., Inc.*, 14 Cal.4th 56, 64 (1996). California Family Code section 910 codifies this *in rem* liability:

> Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt. [Cal. Fam. C. § 910(a), emphasis added. *See also* Cal. Code Civ. P. § 695.020.]

The phrase, "during marriage" does not include "the period during which the spouses are living separate and apart before a judgment of dissolution of marriage or legal separation of the parties." Cal. Fam. C. § 910(b). Debtor and Ms. Cohen were separated in 2010. *See* dkt. 60 at 10:10–11; dkt. 97; dkt. 460 at 5:12.

Therefore the question is whether the debts asserted in the IRS proof of claim were "incurred" before or after the 2010 separation. California Family Code section 903 defines when an obligation is incurred:

> A debt is 'incurred' at the following time:
> (a) In the case of a contract, at the time the contract is made.
> (b) In the case of a tort, at the time the tort occurs.
> (c) In other cases, at the time the obligation arises.
> [Cal. Fam. C. § 903, emphasis added.]

The IRS, the Committee and Debtor argue that, under subdivision "(c)" above, the debts were "incurred" before the 2010 separation when the tax obligations arose. That is either (i) in 2003 through 2008 when Debtor and Ms. Cohen, despite having FBAR accounts, represented on their tax returns that they had no such accounts, failed to file FBAR forms, and did not pay the associated taxes, or (ii) at the latest, in 2009 when the last of those forms and payments were due and that triggered associated penalties.  The IRS briefs cite ample authority for this proposition.  *See, e.g.*, dkt. 460 (citing, *inter alia*, *Espinosa v. Comm'r*, 24 F. App'x 825, 826 (9th Cir. 2001); *Edelson v. Comm'r*, 829 F.2d 828, 833-34 (9th Cir. 1987); *Jeffries v. Comm'r*, 2010 T.C.M. 172 (2010)).

Ms. Cohen argues that the debt is actually a contract debt, created by Debtor's post-separation closing/settlement agreement with the IRS, and therefore the debt supposedly was "incurred" after the marriage.  Ms. Cohen's arguments are unpersuasive.

### 2. The plain meaning of the statute is contrary to Ms. Cohen's argument

Ms. Cohen cites no authority that tax debts incurred pre-separation are somehow transformed by settlement into debts "incurred" post-separation.  That is an unnatural reading of the statute.  For these reasons alone this court rejects her argument.

### 3. Relevant cases are contrary to Ms. Cohen's argument

Although Ms. Cohen's (strained) argument is apparently unprecedented in any reported decisions, what authority does exist strongly supports the contrary conclusion. One such decision is *In re Marriage of Hirsch*, 211 Cal.App.3d 104 (Cal. Ct. App. 1989) (cited in Debtor's Brief, dkt. 461, 15:22–16:3).

The facts in *Hirsch* are very analogous to this case.  During marriage the husband was a director of a failed bank and that failure led to lawsuits.  After separation, the husband settled those lawsuits, although the wife refused to participate in any settlements.  The wife argued that the debts under the settlements were not

community debts, and the trial court agreed, but the court of appeal reversed.  Ms.

Cohen points out that the decision does not explicitly state that the obligations at issue

were "incurred" during the marriage, but that is an essential prerequisite to that court's

holding.  The fact that this issue was not discussed only shows that the court of appeal

viewed it as obvious: settlement of debts incurred pre-separation does not somehow

convert them into debts "incurred" post-separation.

Another decision contrary to Ms. Cohen's argument is *In re Marriage of
Hargrave*, 36 Cal. App.4th 1313 (1995).  In that case, tax debts incurred during the

marriage were settled by the husband after the marriage had terminated, and the

community property was still held liable for those debts even though the IRS had

determined that the wife was an "innocent spouse."

Analogous authority in the bankruptcy context points to the same outcome.  The

Supreme Court has held that, although a settlement agreement and releases may have

"worked a kind of novation," that did not convert nondischargeable tort liabilities into a

dischargeable contract debt.  *Archer v. Warner*, 538 U.S. 314, 323 (2003).

### 4.  Ms. Cohen's attempts to disregard the pre-separation tax debts are unconvincing

Ms. Cohen attempts to bolster her argument by citing numerous cases treating

"closing agreements" with the IRS as contracts.  *See* dkt. 242 at 14:11-22 *and* dkt. 466

at 7:12-26 (Ms. Cohen's Briefs).  *But cf.* dkt. 461 at 13:16–14:20 (Debtor's Brief, citing

authority that rejects the treatment of closing agreements as contracts).

From this premise Ms. Cohen appears to reason that the liability to the IRS was a

purely contractual creation that sprang into existence and was "incurred" post-

separation in 2010.  This court agrees with the preliminary assessment by the State

court (Hon. Mark A. Juhas):

> … the fallacy of [Ms. Cohen's] argument is [that] the agreement that was made with the I.R.S. isn't a separate property agreement.  … He [Debtor] didn't go out and cheat on his taxes after [the] date of separation.  All of this arises from things that happened during marriage.  [Dkt. 464, Ex. D at 28:9-16]

In a similar vein, Ms. Cohen makes numerous arguments to try to distance the liability under the closing agreement from any association with the 2003 through 2008 tax years.  She argues (dkt. 466, 11:1-12:4) that there is no statute that authorizes the IRS to issue a "miscellaneous penalty," and that liability under the closing agreement was calculated not based on the FBAR penalty but instead based on a different formula used for OVDI agreements (*id.* and dkt. 254 at 5:3-7).  She asserts that FBAR penalties only "arise" once the IRS brings a lawsuit, and that the IRS, having elected not to bring such a suit did not pursue FBAR penalties, forfeited the right to allege that the debts at issue were related to the 2003 through 2008 tax years, and instead elected a post-separation contractual liability.  Alternatively, she cites authority that, at least for some purposes, FBAR penalties are not treated as "tax" penalties.  Dkt. 466 at 11:7-19.  Finally (at least as the Committee interprets Ms. Cohen's arguments, dkt. 256 at 9:7-21) she may be arguing that the penalty must be disallowed because it is unauthorized.  These are all red herrings.

There is no evidence to contradict the statements in the closing agreement itself (*Nazarian Adv.* dkt. 10-2, Ex. 28 at PDF pp. 260-64) that it relates to the 2003 through 2008 tax years.  Those were the years in which Debtor and Ms. Cohen failed to disclose their FBAR accounts and pay associated taxes, and the IRS has identified "11 different statutory penalties in each of the disclosed years" for which the "miscellaneous penalty" was a "proxy" (dkt. 460 at 11:25–26).  The IRS has broad statutory authority to settle taxpayer disputes (26 U.S.C. §§ 7121, 7122) and its settlement prior to actually commencing suit does not take away from the fact that it was liabilities for the 2003 through 2008 tax years that were being settled.  Nor is there anything inconsistent with the IRS using a settlement formula under the OVDI program that is similar to, but not as complex as, the calculus that would have actually been used in any FBAR lawsuit.  Ms. Cohen has not cited any authority that would limit the IRS' ability to settle the pre-separation tax liabilities in this manner, or to include claims for several tax years within one settlement and label it a "miscellaneous penalty."  Her attempt to characterize the

pre-separation tax debts as post-separation contract debt is essentially sleight of hand.

### 5. Ms. Cohen's objection that the maximum liability would be $60,000 is unpersuasive

Ms. Cohen appears to take the position (dkt. 466 at 10:24-25, 13:4-5, and dkt. 245 Ex. 1 at 26 (letter to IRS)) that the maximum penalty that could have been asserted against Debtor was $10,000 per year for a total of $60,000. If that is so, the Committee argues (dkt. 256 at 7:21-9:6), then perhaps the closing agreement and IRS liens created an unwarranted advantage for the IRS over similarly situated creditors (although the Committee offers no independent argument in support of Ms. Cohen's position).

As Ms. Cohen concedes (dkt. 466 at 10:24-1), the $10,000 limit only applies if Debtor (and Ms. Cohen) acted without any willful intent to violate the FBAR requirements. She also concedes (*id.*) that if willfulness is shown then the penalties can greatly exceed the dollar amount of the closing agreement.

As a factual matter, Ms. Cohen disputes that she or Debtor had the willful intent to violate the FBAR statutes – she alleges that their tax advisor did not tell them about this obligation. But she does not dispute, and cannot dispute, the false statements on their tax returns that there were no foreign accounts over $10,000. In addition, Debtor recites a litany of facts (dkt. 461 at 15:5-17:22) that could readily result in a finding of willfulness if the dispute had ever gone to trial. Ms. Cohen has not disputed those underlying facts, and even if she did, Debtor has conceded them. Therefore, if the case had ever gone to trial, there would have been every reason for a finder of fact to conclude that Debtor, at least, acted willfully.

The IRS and Debtor also provide calculations showing that any finding of willfulness easily could have resulted in liability many times the roughly $8 million settlement, up to or exceeding, in different scenarios, $26.25 million (dkt. 460 at 12 n. 6) (IRS example) or $58 million (dkt. 461 at 8:24–25, Debtor example), or even $90 million (dkt. 461 at 4:18–26, Debtor example). Ms. Cohen has not disputed these examples.

**6. Ms. Cohen's attempts to transform the community claim into**
**Debtor's sole obligation are unavailing**

Ms. Cohen appears to argue that, because Debtor and the IRS entered into the closing agreement without her, she and all community property are exonerated from any liability.  She also asserts that Debtor should have litigated defenses that, she claims, would have either eliminated or reduced the penalties to a substantially lesser amount. Dkt. 466 at 10:24-11:6 & 14:7–16.  Other parties disagree about her purported innocence (*see, e.g.,* dkt. 460 at 11:28–12:8 *and* dkt. 461 at 7:18–26, 8:24-25, & 11:17-18) but those disagreements raise factual issues that this court need not address because on the undisputed facts Ms. Cohen's arguments miss the mark.

The IRS concedes (dkt. 245 at 12:2 and 12:12-19) that its claim for the miscellaneous penalty is what it calls a "[s]eparate" debt of Debtor.  In other words, although the IRS asserts *in personam* liability against Debtor and *in rem* liability against community property, the IRS is not asserting (at least in its claim filed in this bankruptcy case) *in personam* liability against Ms. Cohen.  Therefore, to the extent that Ms. Cohen is raising defenses to her own *in personam* liability her arguments are irrelevant.

Ms. Cohen apparently is also attempting to second-guess Debtor's settlement of his own liability.  She claims that by entering into that settlement Debtor violated the automatic temporary restraining order ("ATRO") under California Family Code § 2040(a)(2).  Among other things, the ATRO restrains both divorcing spouses from

> transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, whether real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life …. [Cal. Fam. C. § 2040(a)(2)]

It is difficult to see how Debtor's settlement of his own liability amounts to "transferring" any "property" (or any other violation of the ATRO).  Ms. Cohen argues, however, that Debtor violated the ATRO by:

> retroactively impair[ing] the couple's interests in community property.  *See, e.g., Droeger v. Friedman, Sloan & Ross*, 54 Cal.3d

26 (1991) (the transfer of community property realty during marriage, in violation of statute requiring spousal consent, may be invalidated in its entirety by non-consenting spouse).  [Dkt. 242 at 14:27-28]

First, there was nothing "retroactive[]" about the liability under the closing agreement.  That agreement was a settlement of the 2003-08 tax year debts that were incurred prior to separation.

Second, Ms. Cohen cites no authority that one spouse's post-separation settlement of his own liability amounts to a "transfer" of community property.  The one case she does cite, *Droeger*, was decided under a different statute governing consensual liens, and has been distinguished by the California Supreme Court, which interpreted that statute <u>not</u> to limit the usual rule that community property is liable for the debts of either spouse incurred during marriage.  *Lezine*, 14 Cal.4th 56.

Conceivably (although Ms. Cohen does not actually articulate this argument) a settlement that <u>exceeded</u> the liability to which community property was already exposed could be interpreted as the equivalent of a "transfer" of such property within the meaning of the ATRO statute.  But Ms. Cohen offers no reason why Debtor would choose to settle in excess of his exposure to liability.  To the contrary, as set forth above, his actual exposure was far greater than the settlement.

For all of these reasons, there is neither any legal authority nor any factual basis for Ms. Cohen's argument that Debtor's settlement with the IRS somehow violated the ATRO and could be avoided.

### 7.  Conclusion as to Issue 1(a): which portions of the IRS Claim constitute "community claims" under § 101(7)

By far the largest portion of the filed IRS Claim is for the miscellaneous penalty, which arises from the 2003 through 2008 tax years and is for debts that were incurred prior to separation.  Ms. Cohen has not established that the settlement of those debts in 2010 somehow retroactively caused them to be "incurred" after separation.  The IRS has a community claim for the miscellaneous penalty.

Another portion of IRS Claim is for unpaid taxes arising from Ms. Cohen's

separately-filed 2009 tax return.  The IRS has a community claim for this pre-separation debt, for essentially the same reasons that the miscellaneous penalty is a community claim.  The Estate Community Property is liable for the debt of either spouse incurred prior to separation, so Ms. Cohen's pre-separation 2009 tax debts are properly characterized as "in rem" community claims.  *See* 11 U.S.C. 102(2) ("'claim against the debtor' includes claim against property of the debtor).

The IRS Claim also includes some of Ms. Cohen's <u>post</u>-separation tax debts for 2011 and 2012, and those do not qualify as community claims.  As the Committee concedes, however, the IRS can attempt to collect any such debts from Ms. Cohen, based on her *in personam* liability, and in addition the IRS may be able to collect from any separate property interests that she has.  This court agrees with the Committee (dkt. 256 at 7:10-14) that, to the extent that the IRS seeks to "garnish" any distributions to Ms. Cohen from this bankruptcy estate, simply filing a proof of claim is not sufficient; but no doubt the IRS can achieve the same result in various other ways.

The IRS claim with respect to Ms. Cohen's 2010 tax obligations falls somewhere in the middle of the foregoing analysis.  That is the year when the spouses separated, and the parties have not specifically briefed how to treat the tax liabilities arising in that situation.  The IRS has cited authority that taxes accrue at the end of the tax year (*see, e.g.*, dkt. 460) but that general rule may be subject to exceptions in the divorce situation, or perhaps taxpayers can make some sort of short year election or other options.  In addition, the parties disagree about the precise date of separation.  For all of these reasons, it is beyond the scope of this Memorandum Decision to determine whether certain portions of the IRS Claim arising from Ms. Cohen's 2010 tax year are or are not community claims.  That issue is reserved for later determination, and if helpful the parties can address at a future status conference what procedures should apply to such determination.

The last component of the IRS Claim is for Debtor's 2012 tax year.  That debt arose in the post-separation period, so it is not a community claim.  It can be collected

from separate property of Debtor, or from distributions, if any, that he receives on

account of his equity ownership in property of the bankruptcy estate.

### D.  Issue 1(b): the interpled funds

#### 1.  Limits of IRS lien

As the Committee points out, the IRS has conceded that its "lien does not attach

to property and earnings acquired post-petition by the estate."  Dkt. 245 (IRS Opp. to

Committee's Claim Obj.) at 11:1-2.  *See also* dkt. 219 at 4:8-19 (Committee Obj. to IRS

Claim).  In addition, as Ms. Cohen points out (dkt. 467 at 7:20-8:2), there is no showing

that any IRS lien extends beyond Debtor's own property to the revenues of entities in

which Debtor holds an interest.

The IRS has not disputed these assertions, although it adds the caveat that it

expects such property and earnings to be used to fund a chapter 11 plan, including

payment of its claim, and "[t]o the extent future distributions from Elco and Lighton

threaten [its] secured position in the value of the shares of stock and/or membership

interests that are part of the estate, the [IRS] is entitled to adequate protection."  Dkt.

245 at 11:3-10.  Those issues are not before this court for decision at this time, and for

present purposes the point is only that the IRS does not assert a lien on the interpled

funds.

This moots the various arguments by Ms. Cohen (dkt. 467 at 8:3-27) and the

Committee (dkt. 465 at 16:7–13) regarding whether Debtor was only a nominal payee,

whether the IRS can rely on "reverse piercing," and the applicability of alter ego or

similar doctrines.  The remaining issue is whether Ms. Cohen has established any basis

to receive distributions from the interpled funds ahead of the bankruptcy estate.  She

has not.

#### 2.  Limits of Ms. Cohen's interests

Ms. Cohen asserts that she has a prior, separate interest in the interpled funds

"by reason of the Superior Court's award to [her] of one-half of the monthly Lighton

Property rental proceeds, pursuant to its 'Order on Temporary Spousal Support, Child

Support, and Other Related Matters' filed on August 10, 2011." Dkt. 467, 6:21–26. This court does not agree.

As the Committee points out, that order is a *temporary* spousal support order that does not permanently define relative property interests. *See* dkt. 465, 20:16–23 (Committee Brief) *and Nazarian Adv.* dkt. 10-1, Ex. 16, at 156-59) (Order for temporary support). This temporary allocation has no binding effect and is not controlling. In any event, as the Committee argues (dkt. 465 at 16:15-28), once this bankruptcy case commenced the automatic stay superseded any temporary spousal support order insofar as any property division. *See In re Teel*, 34 B.R. 762, 764 (9th Cir. BAP 1983).

Ms. Cohen appears to assert (dkt. 467 at 6:13-7:14 & 9:19-21) that her claimed 50% interest in the Lighton interpled funds attached prior to the bankruptcy case. But her asserted interest in those funds was for purposes of paying support, and she has not argued that she was owed any unpaid support as of the petition date, so that argument is unavailing.

This leaves Ms. Cohen without a basis to assert a "claim" on a par with creditors, let alone a priority over creditors' claims (apart from any unpaid *postpetition* support payments). *See* 11 U.S.C. §§ 507(a)(1) *and* 1129(a)(14)). As noted above, this accords with the general rule that creditors are entitled to be paid first, and thereafter any distributions on account of equity ownership interests are made to the divorcing spouses.

For example, in the factually similar case of *Hirsch* the court of appeal applies the usual rules that "[i]n dividing the community property equally under the mandate of [California divorce law], the court must distribute both the assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations [to creditors] are equal." *Hirsch*, 211 Cal.App.3d 104, 108-09 (citations and internal quotation marks omitted, emphasis altered). In addition, although a spouse may or may not have *in personam* liability for tortious conduct, creditors generally are "able to reach a community asset to satisfy a debt incurred by one spouse alone." *Id.* at

109 (citations and internal quotation marks omitted, emphasis added).   A separate

issue is that "[b]etween the spouses, certain obligations which are properly

characterized as separate may be assigned to the responsible person if unpaid, or

reimbursement may be ordered in favor of the community if the debt was paid from

community assets," but that does not diminish creditors' recoveries. *Id.,* 211 Cal.App.3d

at 109 (citations and internal quotation marks omitted, emphasis added).

The Committee (dkt. 465 at 11:18-12:8) cites numerous authorities that reiterate

these principles. *See Lezine*, 14 Cal.4th 56, 64 (community property liable for debts of

either spouse during marriage, and reimbursement obligations between spouses do not

affect creditors' primacy in collecting from community property to satisfy debts); *United

States v. Berger*, 574 F.3d 1202, 1203-06 (9th Cir. 2009) (community property liable to

satisfy husband's criminal restitution judgment, "including that portion of the property

that otherwise would potentially be awarded upon dissolution of marriage to an innocent

spouse who was not involved in the criminal activity"); *Ordlock v. Commr.*, 533 F.3d

1136, 1138-39 (9th Cir. 2008) (wife was not entitled to refund of community property

payments made on tax debts, because such property was liable for such debts

notwithstanding any alleged "innocent spouse" status with respect to IRS); *In re

McIntyre*, 222 F.3d 655, 658 (9th Cir. 2000) (community property, including non-debtor

spouse's share, was liable for husband's tax debts).

Any "bad acts" by Debtor against Ms. Cohen might be the basis to seek a

reallocation of any property remaining after payment of creditors, but those acts would

not be a basis for any claim competing on a par with creditors, let alone any sort or

priority over such creditors. *See, e.g., Berger*, 574 F.3d 1202 (criminal restitution

judgment); *Ordlock*, 533 F.3d 1136 (husband's tax debts, regardless of wife's alleged

"innocent spouse" status); *In re Provenza*, 316 B.R. 177, 201 (para. 90) & *passim*

(Bankr. E.D. La. 2003) (extensive wrongdoing by debtor both prior to and within

bankruptcy).

Ms. Cohen cites California law that she implies is to the contrary, but as argued

by Debtor (dkt. 461 at 10 n.5) and the Committee (dkt. 465 at 9:19-11:17), those statutes address the allocation of responsibility as between the divorcing spouses, not the liability of community property for debts incurred during the marriage.  Ms. Cohen cites no contrary authority.

Not only are creditors' rights superior under California law; but to the extent of any conflict between California law and the Bankruptcy Code the latter will control under the supremacy clause of the U.S. Constitution, Article VI, Clause 2.  *Teel*, 34 B.R. 762, 764 (citations omitted).  Under the Bankruptcy Code's distribution scheme, creditors have priority over equity interests.  *See, e.g.,* 11 U.S.C. § 544 (estate has "strong arm" rights of hypothetical and actual creditors) and § 1129(b) (so called "absolute priority" of claims over interests).  *In re General Teamsters, Warehousemen and Helpers Union, Local 890,* 265 F.3d 869, 873 (9th Cir. 2001) ("The bankruptcy code establishes a strict priority for satisfaction of obligations of a debtor.  Claims of equity holders are always junior to claims of both secured and unsecured creditors.") (internal citations omitted).

For all of these reasons, Ms. Cohen has not established any primacy of her interests with respect to the interpled funds.  To the contrary, her interests are subordinate to those of creditors and the bankruptcy estate.

### 3. Conclusion regarding Issue 1(b): distribution of interpled funds

There is ambiguity about the proper recipient of some of the interpled funds because certain promissory notes (*Nazarian Adv.* dkt. 10-2, Ex. 28 at 89) were made payable to "Saeed Cohen or Elco Lighting" (emphasis added).  Therefore, it appears that there is a genuine dispute of fact about where the funds came from, and to whom the interpled funds should be repaid as between Debtor and Elco (assuming that, as this court has ruled, the interests of those entities are superior to the interests of the IRS and Ms. Cohen in the interpled funds).  The Committee suggests (dkt. 256 at 19 n.14) that this issue can be deferred by ordering the distribution of the funds to Elco to hold pending further order of this court.  The Committee suggests a similar solution (dkt. 465 at 16-17) with respect to distributing funds to Lighton.  No party in interest has

established any reason to do otherwise, so that is what this court will order.

**E. Issue 1(c): resolution of the Committee's objection to the IRS claims**

Most of the Committee's objections to the IRS claim are resolved above.  The filed IRS Claim includes some debts that might not be fully liquidated and may be disputed on standard tax law grounds – Ms. Cohen's 2009 tax debt is listed as "Pending Examination" (Claim 3-2 at 3), Debtor notes that his 2012 tax liability has yet to be finalized (dkt. 461 at 17:23-18:16), and there may be other debts that are subject to revision.  The Committee acknowledges that the IRS may need to amend its claim, and the rulings in this Memorandum Decision are without prejudice to the rights of the IRS to amend its claim as appropriate, and the rights of other parties in interest to object to amended claims.

**V. CONCLUSION**

This court anticipates directing counsel for the Committee to draft, circulate, and lodge separate orders implementing the decisions set forth above.  Before that, this court intends to review with the parties at the next status conference whether to defer entry of any such orders so as to give all parties in interest at least a short "breathing spell" before having to litigate appeals.  That time could be used for possible settlement discussions, agreements regarding procedures, or similar negotiations.

###

Date: November 13, 2014

Neil W. Bason
United States Bankruptcy Judge